Before discussing the facts or law pertaining to this case, the court desires to make its position clear on the plaintiff's allegation and claim that its business be exempt from municipal regulation because it is engaged in producing products helpful to the war effort. The claim has no merit. If the location in question were found unsuitable for the type of business conducted thereon, it would not prevent the plaintiff from relocating it in a more suitable location even if it involved added expense. While the plaintiff should *Page 287 
be commended for its zeal in producing goods which may help the war effort, it cannot be said that it is conducting its business solely from altruistic motives. It is in business for the purpose of making a profit and, as such, is subject to all legal regulations. this claim, therefore, is disregarded in the court's deliberations.
The plaintiff was incorporated in December, 1937, for the purpose of conducting a wholesale oil business. It leased the building in question on George Street, Wallingford, and used it for the storage of oil in drums and cans.
Late in 1938, it purchased the property and intended to use the building as an oil refinery. The former owner had used it only for the storage of petroleum products, but no refining of any kind had ever been done there. It was not suitable for the ultimate use intended by the plaintiff without extensive repairs and remodeling and installation of appropriate machinery. After the purchase, the plaintiff began the necessary repairs and remodeling and preparation of the building for the reception of machinery. In 1940, it started installation of machinery which it acquired, from time to time, and during the latter part of that year and the early part of 1941, conducted experimental and laboratory work on a small scale. It was not until July, 1941, that the plaintiff began the operation of its plant on a commercial basis. Its process involves the refining of used crankcase and cutting oil. Crankcase oil is drained from automobile crankcases and cutting oil is the residue of oil used by manufacturing establishments in lubricating machinery. The process eliminates foreign substances from the used oil and re-refines it into usable lubricating oil which is in great demand, at the moment, because of increased industrial activity due to the war. The plaintiff's plant adjoins the railroad tracks, on which passenger and freight trains frequently travel, emitting large quantities of smoke and accompanying gases incident to the operation of steam engines. The plant is also located on the edge of a residential neighborhood of fairly good quality, whose occupants represent a good cross-section of American life in such a community. There are other industrial plants in the neighborhood, to the continued existence of which no objections are raised by the neighbors.
While the plaintiff was readying its plant for commercial use, and before refining had commenced, the Borough of Wallingford adopted a zoning ordinance, placing the plaintiff's *Page 288 
property in an industrial zone, and forbidding the operation of an oil refinery in such zone. Unless, therefore, the plaintiff had a nonconforming use, its business was outlawed even before it began. Nevertheless, without objection from borough officials, the plaintiff began refining on a large scale in July, 1941, and from then on its troubles multiplied. In September, 1941, the neighborhood began to complain that objectionable odors emanated from the plant, penetrated into their homes, and adversely affected their sleep, appetites, health and living conditions in general. The refining process originally employed by the defendant permitted certain gases, resulting therefrom, to float unarrested into the atmosphere, and on windy days they were carried into the homes of nearby residents. These gases had, what is chemically known as a mercaptan odor, a sulphur containing organic compound often found in petroleum products. The objections of the neighbors continued and, ultimately, reached the sympathetic ears of the Burgesses of Wallingford. On March 6, 1942, the plaintiff was served with a notice to attend a hearing before the Court of Burgesses on March 10, 1942, to determine whether the plaintiff's business was a nuisance. This hearing was called pursuant to section 48 of the "Revised and Amended Charter and By-laws of the Borough of Wallingford" which, among other things, gives the Court of Burgesses, power "to prevent or regulate the use of any building for the purpose of carrying on trade, business, or manufacture in said borough, which, in the opinion of said Court of Burgesses, shall be prejudicial to public health, or an unreasonable annoyance to those living or owning property in the vicinity." In this connection, it should be noted that the officials invoked their police powers to abate a nuisance rather than to enforce the zoning regulations. The hearing was held on March 10, 1942, and pursuant to the authority above referred to, the plaintiff was notified on March 11, 1942, that the operation of its plant was declared a "nuisance" and was further ordered: "to immediately stop and cease your present method of the operation of the plant which has caused the emissions of objectionable and offensive odors and smells, until such time as you can demonstrate and prove to the satisfaction of the Court of Burgesses that either through equipment installed, or otherwise, you can so operate said business without the emission of such offensive, objectionable and noxious odors and smells without causing an `unreasonable annoyance' to people owning property or living in the vicinity of the plant and without being a `nuisance.'" *Page 289 
On the same day, the plaintiff appealed to this court praying for a temporary and permanent injunction restraining the Court of Burgesses, and its agents, from interfering with its business, and obtained a temporary injunction to such effect. (Devlin, J.) On March 12, 1942, the burgesses moved to dissolve the temporary injunction and a hearing was held thereon. (Devlin, J.) On April 29, 1942, the temporary injunction was dissolved because the court found that, up to the date of trial, the plaintiff had not been successful in eliminating the noxious odors. The court, in its memorandum, however, suggested that the installation of new equipment "will, before the case is fully tried, solve the problem to the satisfaction of all concerned." Before and after the dissolution of the injunction, the plaintiff installed machinery and equipment which, it claimed, successfully eliminated noxious odors. It installed an exhaust system to collect gases and carry them to a boiler where they were consumed, thus preventing their exit into the atmosphere. However, because of the outstanding desist order, the plaintiff was unable to test the effectiveness of its installations and so represented to the court when the case was reached for trial in May, 1942. In view of the suggestion contained in the memorandum of decision dissolving the injunction, and in view of the language of the desist order which offered the plaintiff an opportunity to correct the condition prevailing at the time of the hearing before the burgesses, it appeared to the court that justice to the plaintiff demanded that it be given an opportunity to test the effectiveness of its gas controlling installations. Upon suggestion by the court, it was agreed that the temporary injunction be reinstated, under certain limitations, until such time as the parties had an opportunity to observe and test the effectiveness of the gas controlling installations, while the plant was actually in operation. The court further suggested that, at the trial of the case, the question of whether a nuisance exists be determined on the basis of the claimed improved conditions rather than on the basis of conditions existing at the time of the hearing before the burgesses. This was agreed to by all counsel. The plaintiff, thereupon, resumed operation of its plant and tests were made by expert chemists. As a result of a written report given the burgesses by their expert, they reaffirmed their previous decision and notified the plaintiff to that effect on July 9, 1942. Thereafter, the plaintiff made additional changes designed to further eliminate odors and improve conditions. It covered a sewer vent on the roof of *Page 290 
its building from which odors and gases emanated, thus filling up a leak which it had previously overlooked. The court ruled that this improvement should also be taken into consideration in determining whether a nuisance exists.
During the course of the trial, understandable contradictory testimony on the extent of odors was offered by both sides. The court could not, however, understand why two capable expert chemists should disagree on a question involving a science as exact as chemistry, where, obviously, only one conclusion was possible. The court, therefore, suggested that a series of tests be made simultaneously, by both chemists and a joint report given to each of the parties. This suggestion was adopted and a report signed by both experts was offered and entered in evidence as plaintiff's Exhibit I. The court also obtained permission from counsel to visit the premises, on numerous occasions, and make personal tests and observations. The visits were made by the court under varying weather and atmospheric conditions.
In the meantime, on March 24, 1942, Frank Zingl and approximately 40 other residents in the neighborhood moved that they be permitted to intervene as parties and, on March 25, 1942, the court granted this motion. The intervening parties set up, as a "special defense", the violation, by the plaintiff, of the zoning ordinance adopted by the Borough on August 6, 1940, and asked for an order restraining the plaintiff from conducting its business contrary to said ordinance.
The court has set out the factual history and progress of the case at length in order to apprise the parties of the factors which influenced the decision. It should be helpful in case of an appeal to the Supreme Court.
On the basis of the evidence, the experts' reports and testimony, and personal observation, the court hesitates to condemn the plaintiff's plant and business as a nuisance. It is entirely possible that many of the neighbors have become so "odor conscious" that all unpleasant smells in the neighborhood are attributed to the plaintiff's operation. In fact, the controversy has developed such strong feeling and prejudice on the part of the defendants and the intervening parties that nothing short of complete elimination of the plaintiff's business will satisfy them. On one visit, the court noted a strong gassy odor, which was undoubtedly caused by the smoke emitted by passing trains, and yet, several of the residents insisted *Page 291 
that it came from the refinery. On another visit, a particularly unpleasant odor was noticeable in the cellar of a nearby resident, but it was difficult to associate that odor with any gas created by the refining of petroleum products. Since then, the same odor has manifested itself to the court in a dozen different places far removed from one another and from the plaintiff's plant. The occupant of the dwelling involved, nevertheless, insisted that the plaintiff was responsible for the odor in the cellar. Inspections by the court on seven or eight occasions, under varying weather conditions, failed to disclose any perceptible odor which could be classed as noxious or objectionable. Air samples taken by the defendants' experts in the vicinity of the plant, before all improvements were completed, show such small sulphur content, that harmful odor could not result from it. The joint investigation of the experts finds the present equipment adequate to eliminate odors except during the shutting down period, when odors of unobjectionable intensity are noted.
Because all of these factors militate against a finding that a nuisance exists, great care should be exercised to guard against hasty, arbitrary and unreasonable action which will result in the unnecessary elimination of the plaintiff's business, with consequential loss and hardships. The defendants claim, however, that their finding and decision that a nuisance exists is conclusive and not reviewable by the court. With this contention the court does not wholly agree.
Courts will not interfere with the exercise of the discretionary power of a municipal corporation in declaring what shall constitute a nuisance, except in cases of obvious abuse. In doubtful cases, where a thing may or may not be a nuisance, depending upon a variety of circumstances requiring judgment and discretion on the part of the municipal authorities in exercising their legislative functions, their action under such circumstances will be conclusive on the question; and in such cases the municipality's declaration that a particular thing is a nuisance will not be overruled by the courts. However, since a municipality cannot make a thing a nuisance by merely declaring it to be such, the municipality's declaration that a thing is a nuisance is not a final determination of the question; it is subject to review by the courts, both as to its reasonableness, and as to the thing inveighed against being in fact a nuisance. The naked right to abate something as a nuisance does not carry with it the power, judicially, to determine *Page 292 
whether or not a thing complained of is a nuisance. 43 C.J.Municipal Corporations § 532, p. 409.
It is universally recognized that one of the chief purposes for the institution of municipal government is the conservation of public health and safety. Municipalities may vest in officers wide discretion in matters affecting the application and enforcement of health laws. The nature of ordinances and regulations that may be adopted and enforced is largely discretionary with municipal authorities. Under charter powers, such rights are uniformly liberally construed by courts, and unless clearly unreasonable and arbitrary, or demonstrably violative of constitutional rights, will be sustained. 3 McQuillin,Municipal Corporations (2d ed. 1928) § 954, p. 119.
Under general grant of power respecting nuisances the municipal corporation may declare a thing a nuisance which is one in fact, but cannot declare that a nuisance which is not one, nor suppress a business which is not a nuisance per se.
To constitute a thing a legal nuisance, it must be so in fact, irrespective of an ordinance declaration. City of Buffalo vs.Kellner, 90 Misc. 407, 153 N.Y.S. 472; City of Forney vs.Mounger (Tex.Civ.App.), 210 S.W. 240.
A city has authority to declare what shall constitute a nuisance, but it cannot for that reason act arbitrarily and declare that to be a nuisance which is not so in fact. City ofBushnell vs. Chicago, B. Q. R.R. Co., 259 Ill. 391,102 N.E. 785.
With reference to things which are of such a character that in their nature they may be nuisances, but as to which honest difference of opinion may exist, the exercise by the municipality to declare it a nuisance is conclusive. But what is not a nuisance cannot be conclusively declared as such because it is a question of fact.
A city cannot declare and abate a nuisance if in fact, it is not one. Sings vs. City of Joliet, 237 Ill. 300, 86 N.E. 663.
Whether a thing may or may not be a nuisance, depending on a variety of circumstances requiring judgment and discretion on the part of municipal authorities in exercising their legislative functions under a general delegation of power, their action is conclusive, but that which is not in and of itself by its nature or character, or the manner of its use or disposition a nuisance, cannot be made so by the mere fiat of municipal authorities, and the action of officials is then subject to judicial *Page 293 
review as to reasonableness of the regulations. Smith vs. Cityof New Albany, 175 Ind. 279, 93 N.E. 73; Lonoke vs. Chicago,R. I. P. R. Co., 92 Ark. 546, 123 S.W. 395.
It will be noted that the courts have, uniformly, upheld a municipal declaration, by ordinance, that a thing is a nuisance, but with equal uniformity have they held that powers to condemn delegated to officials are subject to judicial review. Such a course guards the municipality's power to legislate for the health and welfare of its community, and, at the same time, affords protection to property owners against arbitrary action by officials. In the instant case, if the charter and by-laws of the borough declared an oil refinery to be a nuisance and forbade its establishment, such legislation would be conclusive and not subject to review. The question of whether an oil refinery is or is not, in fact, a nuisance would not, under such circumstances, be open to question. The legislative pronouncement to that effect would be sufficient. But where the legislation does not specifically define or designate a nuisance, but gives officials power to do so, their decisions are subject to judicial scrutiny and review. In such cases, their declaration that a thing is a nuisance may be challenged on appeal and becomes a question of fact for the court.
This case clearly illustrates the wisdom of prevailing judicial opinion. The charter and by-laws of the borough do not forbid a refinery. They give authority to prevent and regulate the use of buildings, etc. In exercising the authority, the burgesses declared the plaintiff's business a nuisance and ordered its cessation "until such time as you can demonstrate and proveto the satisfaction of the Court of Burgesses that either through equipment installed or otherwise, you can so operate said business without the emission of such offensive, objectionable, and noxious odors and smells without causing an `unreasonable annoyance' to people owning property or living in the vicinity of the plant and without being a nuisance." To require the plaintiff to "demonstrate and prove to the satisfaction of the Court of Burgesses" that it has complied with their order, is arbitrary and unreasonable, and can, easily, lead to an abuse of power. For no matter how effective and efficient its installed equipment may be, it still may not satisfy the burgesses. For this reason the plaintiff is entitled to a judicial review of the reasonableness of the order and a determination of whether its business is, in fact, a nuisance. State ex rel. Redgate vs.Walcott, 125 Conn. 160. *Page 294 
The court having found that the plaintiff's business is not a nuisance, it follows that its prayers for relief ought to be granted.
The intervening parties have set up the zoning ordinance as a special defense, and insist that the plaintiff's violation thereof should be enjoined. Undoubtedly, they are proper parties to the controversy because they have an interest in its outcome. But their activity cannot go beyond the controversial issues. The cases cited by them involve zoning appeals in which interested property owners are permitted to intervene and assist in prosecuting or contesting such appeals. None of the cited cases permit the intervening parties to bring in new matters or defenses which go beyond the realm considered by the zoning boards. The burgesses could have taken appropriate action within the provision of the zoning law. They preferred, however, to pursue the course under their granted police powers. The appeal to this court is limited to a consideration of matters relating to this particular controversy. Defenses, not related to the issues involved between the original parties, cannot be injected into the proceedings by the cross complaint of added parties.
"The test is whether the transactions are distinct and independent or are connected in the sense that the claim under the cross-complaint is so related to that made in the complaint that consideration of the former is essential to a full adjudication of the parties' rights as to the latter." Puleo vs. Goldberg,129 Conn. 34.
The question raised by the cross complaint is an entirely separate matter from that raised by the appeal. For this reason, the relief sought by the cross complaint is denied.
In considering and determining the case, the court has not been unmindful of the duties of the defendants and the rights of the intervening parties, and serious consideration was given them. The evidence, however, fails to justify complaints at this time. This decision must not, however, be regarded, by the plaintiff, as a license to relax in its duty to keep its plant in the present condition, or to make even further improvements, from time to time, as science and mechanical skill reveal them. Its vigil must be strict and constant.
 The issues on the plaintiff's complaint, defendants' answer, and the intervening parties' cross complaint are found for the